## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

BYRON DAVID SMITH,                              Case No. 17-cv-673 (JRT/TNL)

        PETITIONER,

v.                                                                      **REPORT AND**
                                                                        **RECOMMENDATION**

MICHELLE SMITH, *WARDEN,*
*MINNESOTA CORRECTIONAL*
*FACTILITY – OAK PARK HEIGHTS*,

        RESPONDENT.

---

Steven J. Meshbesher, Meshbesher & Associates, P.A., 10 South Fifth Street, Suite 225, Minneapolis MN 55402, and Adam T. Johnson, Lundgren & Johnson, P.S.C., 101 Fifth Street East, Suite 1700, Saint Paul MN 55101 (for Petitioner Byron David Smith); and

Brent D. Wartner, Assistant Washington County Attorney, Washington County Attorney's Office, 15015 62nd Street North, P.O. Box 6, Stillwater MN 55082 (for Respondent Michelle Smith).

---

This matter is before the Court, United States Magistrate Judge Tony N. Leung, on a petition pursuant to 28 U.S.C. § 2254 for a writ of habeas corpus. (ECF No. 4). This action has been referred to the undersigned for a report and recommendation to the Honorable John R. Tunheim, Chief Judge for the United States District Court for the District of Minnesota, under 28 U.S.C. § 636 and Local Rule 72.2(b). Based on all the files, records, and proceedings herein, and for the reasons set forth below, this Court recommends that the petition be denied.

## I.    PROCEDURAL AND FACTUAL BACKGROUND

### A.  The Thanksgiving Day 2012 Shootings

During the fall of 2012, Petitioner Byron David Smith "was the victim of a series of burglaries at his home." *State of Minnesota v. Smith*, 876 N.W.2d 310, 317 (Minn. 2016). The police were unable to determine who was responsible. *Id.* So, before midday on Thanksgiving Day, November 22, 2012, Smith moved his vehicle down the street from his home, entered surreptitiously through his home's rear entrance, and went into his basement and started a digital audio recorder. *Id.* Smith was seated in a reading chair with "a novel, a water bottle, and some snack bars" and was "facing the side of the basement stairwell." *Id.* Smith had a nine-shot revolver on his belt clip and "[s]teps away" from where Smith sat was his loaded mini-14 rifle. *Id.* Running in an adjacent basement workroom was an outdoor video surveillance system comprised of "four security cameras placed around the exterior of Smith's home." *Id.*

At 12:33 p.m., Nicholas Brady "approached Smith's house, looked into the windows, and tried the doorknobs." *Id.* "Smith heard the doorknobs rattling, saw a shadow in front of the picture window in the basement, and listened as Brady walked across the deck." *Id.* Brady then broke the glass of Smith's bedroom window and entered Smith's home. *Id.* Approximately two minutes later, Brady "approached the basement stairs" with Smith waiting below. *Id.* at 317–18. "As Brady descended the stairs, Smith saw Brady's feet, his knees, and then his hip. Smith shot Brady in the chest with the rifle." *Id.* at 318. "Smith shot Brady a second time. Brady tumbled down to the basement floor, face up. Three seconds later, at close range, Smith shot the groaning Brady. The

bullet went through Brady's hand and then through the side of his head. Smith said to Brady, 'You're dead.'" *Id.* Smith then grabbed a "tarp from near the basement fireplace" and "put Brady on the tarp and dragged him to the adjoining workroom." *Id.* Smith reloaded his rifle. *Id.*

About ten minutes after Brady entered Smith's home, and eight minutes after the shooting, "Haile Kifer entered Smith's house," quietly calling out "Nick." *Id.* Kifer heard no response, so she "started down the basement stairs," again calling out for Brady. *Id.* As with Brady, "Smith fired when he saw Kifer's hips, but before he saw her hands." *Id.* Kifer, who was shot at "point blank range," fell down the stairs, with Smith attempting to "shoot her again, but his rifle jammed." *Id.*

> Smith commented, "Oh, sorry about that." Kifer exclaimed, "Oh my God!" Smith pulled out his revolver and shot her. Amidst Kifer's screams, Smith shot her a third time and a fourth time. Smith said, "You're dying!" Kifer screamed. Smith shot her a fifth time. Calling her "bitch," Smith dragged Kifer into the workroom and placed her on the tarp on top of Brady's body. But Kifer was not yet dead, so Smith shot her a sixth and final time.

*Id.* Smith later called it "a good clean finishing shot." *Id.* at 320.

Smith then stayed in his house for five hours following the shootings. *Id.* at 318. Smith's digital audio record captured him talking to himself. *Id.* at 318–19 (detailing Smith's various statements). Smith did not call law enforcement on November 22. *Id.* at 319.

The following day, Smith asked his neighbor to contact an attorney and, later, to contact the sheriff's office because "he had solved the break-ins in the neighborhood." *Id.* Once law enforcement arrived and approached Smith's house, Smith came outside with

his hands up and said he needed to tell them something. *Id.* Smith led law enforcement into his home, explaining that "he was a victim of previous burglaries, the most recent occurring the day before, on Thanksgiving." *Id.* Smith showed officers the broken glass in his bedroom. *Id.* Smith then "told the officers he needed to show them something in the basement," where they saw the bodies of Kifer and Brady on the tarp. *Id.* Smith was arrested and brought to the sheriff's office for questioning. *Id.* at 319–20.

### B. State District Court Proceedings

Smith was charged via criminal complaint with two counts of second-degree murder. *Id.* at 321. A grand-jury then indicted Smith on two-counts of first-degree premeditated murder. *Id.* Smith moved to dismiss the indictment, which the district court denied. *Id.*

"A major theory of Smith's defense was that, in shooting Brady and Kifer, he was acting to defend his home against burglars whom he believed might be armed and dangerous." *Id.* at 337–38 (Stras J., concurring). On March 25 and April 17, 2014, the district court held pretrial hearings which were open to the public. *Id.* at 327, 330, 338. The district court heard "motions in limine, including the issue of the extent to which Smith could offer evidence of the previous burglaries of his house." *Id.* at 327. At the hearing, Smith argued that he should be able to call three witnesses at trial to testify: Brady's mother and Brady's friends, C.K. and J.K., both of whom allegedly had been involved in previous burglaries with Brady. *Id.* at 327, 338. "Defense counsel discussed Brady's alleged co-participants by name at the hearing, so those names were in the public record." *Id.* at 327.

Following the April 17, 2014 pretrial hearing, the court next convened on April 21; voir dire had been completed, but the jury had not yet taken its final oath.[1] *Id.* at 327, 338. April 21, 2014 was "the day the parties would present opening statements and witnesses to the jury." *Id.* at 327. The "deputy court administrator called the case" and the "court then closed the courtroom to all except the attorneys, the defendant, and court staff." *Id.* The district court noted, on the record, that: "We have just cleared the courtroom just for a quick moment from the spectator gallery." *Id.* Smith's attorneys objected to the closure, stating:

> "Your Honor, this is a—I thought about the court's suggestion, and I would ask the court to reconsider." Defense counsel asked that the public be allowed to be present, including media, because "[t]o not allow that would infringe upon the freedom of the public to be present as well as the free press. [Smith] has that right to a public trial."

*Id.* The district court

> proceeded to discuss the 'pretrial ruling of the court' and advised the parties and Smith that the court had ruled to exclude some of the evidence of Brady's prior bad acts. As part of the ruling, the court explained that defense counsel could not "disclose the names of [J.K., C.K.] or Brady involved in prior burglaries before November 22, 2012." The court stated that the evidence was inadmissible because Smith did not know the identity of those who broke into his home before Thanksgiving.

*Id.* After discussing its pretrial ruling, the district court provided its reasoning for closing the courtroom:

> And for that reason—that was the reason that the court is not allowing the press in for this ruling, because otherwise it could be printed, and indeed,

---

[1] Smith and Respondent agree that jury voir dire for trial began on April 14, 2014 and continued through April 16, 2014. (ECF No. 13, at 5; ECF No. 2, at 2; *see also* Resp't Ex. C, at 753:9–754:11, ECF No. 12) (administering final oath to jury)); *Smith*, 876 N.W.2d at 328, 338 (noting that the jury arrived on April 21, 2014 following the courtroom closure to be immediately sworn and hear opening statements).

> while the jurors hopefully will follow the admonition not to read or hear anything in the press and TV and such in the meantime while this case is pending, certainly the media would publish and print the substance of the court's pretrial ruling, and then of course it runs the risk of getting to the jury if for some reason they don't adhere to their oath.

*Id.* Following a discussing concerning whether Smith could call C.K. as a witness, the courtroom was reopened. *Id.* at 327–28.

Immediately following the closed proceeding, at 10:00 a.m., "the judge filed a written order on the motion in limine heard on April 17 and then discussed briefly in the closed courtroom." *Id.* at 328.[2] The order

> ruled that evidence of prior bad acts by Brady or Kifer, of which Smith was not aware at the time of the shooting, would be inadmissible at trial. The order explained that 'insofar as the [evidence that Smith was the victim of prior burglaries occurring before the shooting, that forcible entry was made, and that weapons were taken that were not recovered at the time of the shooting] may be received through the testimony of . . . law enforcement agents, there will be no need to seek its admission through more prejudicial means (*i.e.,* through the testimony of Brady's mother or of a perpetrator of the prior break-ins).'

*Id.* (first alteration in original). The order did not name J.K. or C.K., *id.*, "therefore [it] provided less information to the public than would have otherwise been available had the courtroom been open that morning," *id.* at 338.[3] At 10:03 a.m., the jury entered the courtroom to be sworn and to hear opening statements. *Id.* at 328, 338.

At trial, Smith's main defenses were that he used reasonable force in defense of himself and his dwelling. *Id.* at 321; *id.* at 337–38. Following trial, a jury found Smith

---

[2] The parties each provided this Court a copy of the April 21, 2014 order. (Resp't Ex. B; ECF No. 6).
[3] Moreover, the April 21, 2014 order does not specifically tie itself to the closed proceeding occurring on April 21, 2014, other than being filed on the same day. Rather, it makes sole reference to the April 17, 2014 pretrial hearing. (Resp't Ex. B, at 1).

guilty of two counts of second-degree murder and two counts of first-degree premeditated murder. *Id.* at 321. The district court convicted Smith of two counts of first-degree premeditated murder and sentenced him to two concurrent life sentences without the possibility of release. *Id.* Smith appealed, but that appeal was stayed pending a restitution hearing. *Id.* Following the conclusion of the restitution hearing and the issuance of a restitution order by the district court, Smith's appeal was reinstated. *Id.*

### C. Appeal to the Minnesota Supreme Court

On direct appeal to the Minnesota Supreme Court, Smith argued, *inter alia*, that the district court erred "when it briefly closed the courtroom to spectators and the press." *Id.* Smith asserted the closed proceeding violated his right to a public trial under the Sixth Amendment to the U.S. Constitution and its state counterpart, Article I, Section 6 of the Minnesota Constitution. *Id.* at 328. Smith argued that, were the Court to consider the four factors described by *Waller v. Georgia*, 467 U.S. 39 (1984), it would find his Sixth Amendment right was violated. *Smith*, 876 N.W.2d at 329.

The Minnesota Supreme Court never reached *Waller*. Instead, it found that no Sixth Amendment closure occurred in Smith's case. The Minnesota Supreme Court noted it has

> previously recognized that "the right to a public trial is not an absolute right." [*State v. Fageroos*, 531 N.W.2d 199, 201 (Minn. 1995)]. Some situations warrant restrictions on public access, [*State v. Taylor*, 869 N.W.2d 1, 10 (Minn. 2015)], and other courtroom restrictions do not implicate a defendant's right to a public trial. *Id.* at 11 (citing [*State v. Brown*, 815 N.W.2d 609, 617 (Minn. 2012)]). In [*State v.*] *Lindsey*, for example, we determined that some closures are "'too trivial to amount to a violation of the [Sixth] Amendment.'" 632 N.W.2d [652,] 660–61 [Minn. 2001] (alteration in original) (quoting *Peterson v. Williams*, 85 F.3d 39, 42

(2d Cir. 1996)). Other nonpublic proceedings simply may not implicate the Sixth Amendment right to a public trial, depending on the nature of the proceeding.

*Smith*, 876 N.W.2d at 329.

The Minnesota Supreme Court went on to note that, in *Waller*,

the United States Supreme Court made clear that a suppression hearing is of comparable status to a trial. But courts have distinguished suppression hearings from other "administrative" proceedings that do not implicate the Sixth Amendment right to a public trial. Contrary to what the "administrative" label suggests, such proceedings are not limited to purely administrative procedures before the court, such as scheduling. Instead, courts have also treated routine evidentiary rulings and matters traditionally addressed during private bench conferences or conferences in chambers as routine administrative proceedings. *[United States] v. Norris*, 780 F.2d 1207, 1209–11 (5th Cir. 1986); *State v. Hicks*, 837 N.W.2d 51, 61 (Minn. [Ct.] App. 2013), *aff'd on other grounds*, 864 N.W.2d 153 (Minn. 2015). It is the type of proceeding, not the location of the proceeding, that is determinative. *See* [*State v. Everson*, 749 N.W.2d 340, 352 (Minn. 2008)] (explaining how the courtroom was transformed into the jury room by the judge's instructions); *Hicks*, 837 N.W.2d at 60–61 (determining that the district court held a "chambers conference" in the courtroom).

*Smith*, 876 N.W.2d at 329.

The court continued, relying upon *Norris*, noting that

[i]n administrative proceedings, "[n]on-public exchanges between counsel and the court on such technical legal issues and routine administrative problems do not hinder the objectives which the Court in *Waller* observed were fostered by public trials." *Norris*, 780 F.2d at 1210. In contrast to a suppression hearing, these administrative exchanges "ordinarily relate to the application of legal principles to admitted or assumed facts so that no fact finding function is implicated. A routine evidentiary ruling is rarely determinative of the accused's guilt or innocence." *Id.* at 1210. Additionally, "such evidentiary rulings ordinarily pose no threat of judicial, prosecutorial, or public abuse that a public trial is designed to protect against." *Id.* at 1210–11.

*Smith*, 876 N.W.2d at 329–330. The Minnesota Supreme Court cited examples where "courts have allowed nonpublic proceedings for evidence-related proceedings," including "deciding whether a witness will testify under threat of contempt," "determining the scope of witness immunity," "sidebar conferences on evidentiary rulings," and "consideration of offers of proof." *Id.* at 330. (citations omitted). The court also relied on its own precedent where it has "distinguished between the key phases of trial, on the one hand, and the concept of bench and chambers conferences, on the other. . . . [B]ench and chambers conferences may occur, so long as a record is made and the record is available to the press and the public." *Id.* (citing *Minneapolis Star & Tribune Co. v. Kammeyer*, 341 N.W.2d 550, 560 (Minn. 1983)).

Ultimately, the Minnesota Supreme Court held "the district court's nonpublic proceeding was administrative in nature and did not constitute a closure implicating Smith's Sixth Amendment right to a public trial." *Smith*, 876 N.W.2d at 330. The court reasoned that

> The brief proceeding was an outgrowth of two previous public hearings, held on March 25 and April 17, on the subject of evidence of other burglaries. These hearings resulted in public orders dated April 4 and April 21. The essence of the nonpublic proceeding was the court explaining the parameters of its April 21 written decision. This was an issue of evidentiary boundaries, similar to what would ordinarily and regularly be discussed in chambers or at a sidebar conference—on the record, but outside the hearing of the public. The discussion took only minutes, it was transcribed, and it consumed only two-tenths of one percent of the trial transcript. Smith received a public trial.

*Id.* (footnotes omitted).[4] The Minnesota Supreme Court also included the following in a footnote: "Given that the names [of J.K. and C.K] were in the public record as of April 17, we do not understand the district court's rationale for closing the proceeding to the public. But any error in doing so was not of constitutional magnitude." *Id.* at 330 n.8.

The Minnesota Supreme Court's Sixth Amendment reasoning was not unanimous; Minnesota Supreme Court Associate Justice David Stras filed a concurring opinion specifically concerning the courtroom closure. Justice Stras noted that the "trial in this high-profile case, which captured the attention of Minnesotans because of its unusual facts and the deaths of two teenagers, is precisely the type of trial for which the protection of the Sixth Amendment is most critical." *Id.* at 337 (citing *In re Oliver*, 333 U.S. 257, 268–71 (1948)). Justice Stras wrote that the "district court's reason for the closure—to keep the media from printing the identity of the witnesses and the content of their potential testimony—was plainly unacceptable in light of the purposes underlying the Sixth Amendment public-trial right and the press's First Amendment right of access to the courts." *Smith*, 876 N.W.2d at 337, 339. Justice Stras identified three flaws that "underpin" the district court's reasoning: (1) "the concern that the press might publish an account of a proceeding should weigh in favor of keeping the courtroom doors open, not against it, because press coverage serves the important structural safeguard of opening the judicial process to public inspection;" (2) "the court's reasoning applies to *every* instance in which a court elects to conduct proceedings outside of the hearing of the jury: if the press and the public are present for such proceedings, then there is always the

---

[4] The parties each provided this Court a copy of the April 4, 2014 order. (Resp't Ex. A; ECF No. 5).

possibility that the information might somehow reach the jury;" and (3) "the procedure selected by the court—closure of the courtroom—was unlikely to achieve its desired effect." *Id.* at 340–41. Accordingly, if Justice Stras "were to apply the *Waller* factors to the courtroom closure in this case, there is little doubt that the closure would fail them." *Id.* at 341.

Nevertheless, Justice Stras concluded that the closure in Smith's case did not violate the Sixth Amendment because he was "unconvinced that the closure here occurred during Smith's 'trial.'" *Id.* at 337. Justice Stras described "[t]he most analytically difficult question in this case is whether the district court's explanation of a pretrial evidentiary ruling constitutes a part of the 'trial' to which the public-trial right attaches." *Id.* at 341. He expressed reticence to follow the majority's acceptance of the Fifth Circuit's approach in *Norris* to the extent that it drew a constitutional line by not extending "the Sixth Amendment public-trial right to discussions of routine evidentiary matters and other administrative tasks" *Id.* at 342. Rather, Justice Stras concluded that "the relevant question is whether a criminal proceeding resembles, and thereby possesses the characteristics of, a bench or jury trial." *Id.* at 343. Following this, he concluded "nothing . . . occurred during the brief hearing on the morning of April 21, 2014 that resembled a bench or jury trial." *Id.* The "trial-like aspects of the proceedings—specifically, the consideration of witness testimony and the arguments of counsel—occurred during a hearing in open court on April 17, 2014 . . . ." *Id.* Thus, even though Justice Stras believed "the district court should not have closed the courtroom," he could not "conclude under these facts that the closure violated Smith's rights." *Id.*

### D. Federal Habeas Petition

Smith sought habeas relief pursuant to 28 U.S.C. § 2254 on March 3, 2017. (ECF No. 4). Smith asserts he is entitled to habeas relief because his Sixth Amendment right to a public trial was violated by reason of the April 21, 2014 courtroom closure. Respondent timely filed an answer. (ECF No. 12). While the petition was under advisement, the parties submitted letters on the application of *Weaver v. Massachusetts*, 137 S.Ct. 1899 (2017), to Smith's petition. (ECF Nos. 19, 20).

## II.    ANALYSIS

### A. Legal Standard

The Antiterrorism and Effective Death Penalty Act of 1996 (hereinafter "AEDPA") governs a federal court's review of habeas corpus petitions filed by state prisoners. Section 2254 is used by state prisoners alleging they are "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). A federal court may not grant habeas corpus relief to a state prisoner on any issue decided on the merits by a state court unless the proceeding "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or it "(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

A state court decision is contrary to the Supreme Court's clearly established precedent "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are

materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent." *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000). "An 'unreasonable application' of Supreme Court precedent occurs when a state court correctly identifies the governing legal standard but either unreasonably applies it to the facts of the particular case or unreasonably extends or refuses to extend the legal standard to a new context. *Munt v. Grandlienard*, 829 F.3d 610, 614 (8th Cir. 2016) (citing *Williams*, 529 U.S. at 407). "In other words, it is not enough . . . to conclude that, in [the court's] independent judgment, [it] would have applied federal law differently from the state court; the state court's application must have been objectively unreasonable." *Rousan v. Roper*, 436 F.3d 951, 956 (8th Cir. 2006).

The Sixth Amendment provides that "the accused shall enjoy the right to a . . . public trial" in all criminal prosecutions. U.S. CONST. amend VI. The Sixth Amendment right to a public trial helps ensure "that judge and prosecutor carry out their duties responsibly" and "encourages witnesses to come forward and discourages perjury." *Waller*, 467 U.S. at 46. This right "to an open courtroom protects the rights of the public at large, and the press, as well as the rights of the accused." *Weaver*, 137 S.Ct. at 1910. The right to an open trial "may give way in certain cases to other rights or interests, such as the defendant's right to a fair trial or the government's interest in inhibiting disclosure of sensitive information." *Waller*, 467 U.S. at 45. "Such circumstances will be rare, however, and the balance of interests must be struck with special care." *Id.* According to the Supreme Court:

13

the party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, the closure must be no broader than necessary to protect that interest, the trial court must consider reasonable alternatives to closing the proceeding, and it must make findings adequate to support the closure.

*Id.* at 48; *accord Press-Enterprise Co. v. Superior Ct. of Cal.*, 464 U.S. 501, 510 (1984) ("The presumption of openness may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest. The interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered."). The Sixth Amendment right to a public trial clearly extends to pretrial suppression hearings, *Waller*, 467 U.S. at 46, 48, and jury selection, *Presley v. Georgia*, 558 U.S. 209, 213 (2010) (per curiam). "[V]iolation of the right to a public trial is a structural error," but "it is subject to exceptions." *Weaver*, 137 S.Ct. at 1908–09.

### B.  AEDPA Requires Denial of Habeas Relief

Here, the Minnesota Supreme Court found the courtroom closure did not implicate Smith's Sixth Amendment right. Rather, the Minnesota Supreme Court, relying upon its own precedent, buttressed by the Fifth Circuit's *Norris* decision, held the closure did not occur during Smith's trial, but as an offshoot of a pretrial proceeding and, according to the rationale of the majority, was "administrative" in nature. Thus, the Minnesota Supreme Court did not address the *Waller* factors.

Smith disputes this characterization of the closure, arguing that the closure occurred during trial because jury selection had been completed and opening statements were imminent. As such, Smith asserts the closure was not "administrative" and that

*Waller* applies in full force. It follows, Smith argues, that in failing to apply *Waller*, the Minnesota Supreme Court's decision was contrary to clearly established Federal law as determined by the Supreme Court of the United States. *See Lafler v. Cooper*, 566 U.S. 156, at 173 (2012) (identification of correct legal claim but failure to apply appropriate standard constitutes a decision contrary to clearly established federal law).

Here, were this a *de novo* review, the question of whether Smith's Sixth Amendment rights were violated may well be debatable and, depending on the outcome of that debate, possibly even result in a different outcome. This is not, however, a direct appeal where this Court addresses the issue *de novo*. *See Irby v. Smith*, Case No. 15-cv-1997 (PJS/TNL), 2016 WL 3255019, at *2 (D. Minn. June 13, 2016). Rather, this is a habeas proceeding where the question is not whether Smith's Sixth Amendment rights were violated, but whether the Minnesota Supreme Court's conclusion that Smith's Sixth Amendment rights were not violated was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); *Irby*, 2016 WL 3255019, at *2. The "'unreasonable application' of those holdings must be 'objectively unreasonable,' not merely wrong; even 'clear error' will not suffice." *White v. Woodall*, 134 S.Ct. 1697, 1702 (2014) (citations and quotations omitted).

This difficult hurdle requires that "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 131 S.Ct. 770, 786–87

(2011). Moreover, the error must be clear from Supreme Court precedent existing at the time of the state court's decision; it is not enough for the state court decision to conflict with precedent of the federal courts of appeal. *Lopez v. Smith*, 135 S.Ct. 1, 2 (2014) ("We have emphasized, time and again, that [AEDPA] prohibits the federal courts of appeals from relying on their own precedent to conclude that a particular constitutional principle is 'clearly established.'"). Even then, the state court's decision must conflict with a holding of the Supreme Court; a conflict with dicta is insufficient to support habeas relief. *Williams*, 529 U.S. at 412 ("clearly established Federal law" means "the holdings, as opposed to the dicta, of this Court's decisions as of the time of the relevant state-court decision").

Under AEDPA's strict standard, Smith's claim cannot succeed. The Minnesota Supreme Court's decision does not conflict with any holding of the United States Supreme Court for the simple reason that the highest court of this nation has not clearly addressed whether the Sixth Amendment applies to pretrial hearings on, or proceedings related to, motions in limine. To be fair, *Waller* clearly held that the Sixth Amendment extends to pretrial suppression hearings. The closure here, though, as determined by the Minnesota Supreme Court, occurred as part of a pretrial proceeding in preparation of trial, before the second oath by the jury at which time jeopardy attaches, and before opening statements and testimony of trial witnesses. While Smith disputes the characterization of the closure as occurring during a pretrial proceeding, arguing that it took place during trial or a proceeding that was similar enough to trial or a suppression hearing to constitute one or the other, the timing of the closure is undisputed. Under

AEDPA, "a determination of a factual issue made by a State court shall be presumed to be correct." 28 U.S.C. § 2254(e)(1). Thus, this Court is operating under the Minnesota Supreme Court's conclusion that the closure occurred during a pretrial proceeding. The United States Supreme Court has not addressed whether the Sixth Amendment applies to a pretrial motion hearing, or proceeding related thereo, akin to a hearing on motions in limine. Thus, the Minnesota Supreme Court was not objectively unreasonable in deciding not to apply *Waller* to the closure at issue here.

### C. *Waller*, Were it Applicable, Would Invalidate this Courtroom Closure

While this Court recommends that Smith's habeas petition be denied, this is not to say that the closure in Smith's case was appropriate beyond debate. The state district court offered a singular reason for its *sua sponte*, complete courtroom closure: that the media *might* publish the substance of the court's pretrial ruling which *could* then be seen by jurors despite admonitions to the contrary. This proffered reason runs precipitously at, if not beyond, the boundaries and spirit of the Sixth Amendment and *Waller*, if it were to apply.

To being with, the trial court's sole articulated reason was speculative. Indeed, this very justification was discussed in *Waller*: "One of the reasons often advanced for closing a trial—avoiding tainting of the jury by pretrial publicity, e.g., *Press-Enterprise Co.*, 464 U.S. at 510—is largely absent when a defendant makes an informed decision to object to the closing of the proceeding." *Waller*, 467 U.S. at 47 n.6. This "rationale is further attenuated where . . . the jurors have been . . . instructed not to discuss the case or read or view press accounts of the matter." *Id.*

Here, Smith objected to the closure of the courtroom, citing both his right to a public trial as well as the rights of the public and press to witness the same. The trial court itself acknowledged that the jurors had been admonished not to learn about the case via the press. The trial court's reasoning is even more susceptible to challenge given that the names the state court sought to prevent from spreading to the jurors were already in the public record by reason of the previous pretrial hearings held on the topic. While noting that it did "not understand the district court's rationale for closing the proceeding to the public," *Smith*, 876 N.W.2d at 330 n.8, the Minnesota Supreme Court upheld the closure.[5]

Additionally, the trial court's sole reason also may arguably run afoul of the First Amendment rights of the press and public to attend a criminal trial. *See Globe Newspaper Co. v. Superior Court for Norfolk County*, 457 U.S. 596 (1982). While the press, as a nonparty amicus, raised a separate First Amendment argument concerning the courtroom closure, the Minnesota Supreme Court declined to address the issue on procedural grounds. *Smith*, 876 N.W.2d at 327 n.5. Here, the courtroom closure prevented the press and the public from observing a proceeding in a criminal case—even though two

---

[5] Minnesota state case law concerning courtroom closures has been criticized by members of the Minnesota Supreme Court itself. *See, e.g.*, *State of Minnesota v. Brown*, 815 N.W.2d 609, 622–27 (Minn. 2012) (Meyer J., dissenting) (would apply *Waller* analysis); *State of Minnesota v. Silvernail*, 831 N.W.2d 594, 607–09 (Anderson J., dissenting) (arguing that *Brown* should be overruled due to "creeping courtroom closure"). This criticism is reflected similarly in scholarly papers. *See, e.g.*, Zach Cronen, *Behind Closed Doors: Expanding the Triviality Doctrine to Intentional Closures* – State v. Brown, 40 WM. MITCHELL L. REV. 252 (2013) (arguing the "majority [in *Brown*] failed to properly analyze the purpose and scope of the triviality doctrine when it was applied to intentional closures," which "further muddies the analysis between trivial closures and harmless errors, running afoul of U.S. Supreme Court precedent"); Daniel Levitas, *Scaling* Waller: *How Courts Have Eroded the Sixth Amendment Trial Right*, 59 EMORY L.J. 493, 533 (2009) (describing Minnesota as "employ[ing] post hoc rationale[] justifying closure despite the plain language of *Waller* that forbids it").

previous pretrial hearings covering the same topics were public; the orders issued as a result of those hearings were public; and the witnesses' names were already available through those previous hearings.

If the pretrial proceedings in this case were to be likened to a pretrial suppression hearing as Smith argues,[6] a compelling argument could be made that the trial court's courtroom closure fails the *Waller* analysis. As discussed, there was arguably no overriding interest likely to be prejudiced where the proposed harm was purely speculative and already capable of occurring by reason of the previous two public pretrial hearings. Even accepting the trial court's proffered interest in closure, there is no indication there was consideration of reasonable alternatives to complete closure of the courtroom, such as repeating the admonition that the jurors not consume any media related to Smith's case. Nor is there indication that the state district court considered a more narrowly-tailored closure, such as permitting family members of Smith and the victims, or a representative press member, to remain during the pretrial proceeding in court. If the law were to mandate application of *Waller* and, further, if this Court were reviewing this matter *de novo*, it would be inclined to find the courtroom closure here was contrary to law.

---

[6] As noted by the Supreme Court, pretrial suppression hearings "often are as important as the trial itself." *Waller*, 467 U.S. at 46, 48. Moreover, suppression hearings "often resemble[] a bench trial: witnesses are sworn and testify, and of course counsel argue their positions." *Id.* at 47. Thus, the "need for an open proceeding may be particularly strong with respect to suppression hearings" because a "challenge to the seizure of evidence frequently attacks the conduct of police and prosecutor." *Id.* The public also holds a strong interest "in exposing substantial allegations of police misconduct to the salutary effects of public scrutiny." *Id.*

### D. Conclusion

But, notwithstanding these concerns and the analytical assumptions underlying them, Smith's relief under this federal habeas petition must be denied. *See Williams*, 529 U.S. at 365 (a "federal habeas court may not grant relief simply because it concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable."); *Yarborough v. Alvarado*, 541 U.S. 652, 665 (2004). For AEDPA purposes, the Minnesota Supreme Court's decision cannot be deemed unreasonable where there is a lack of clear guidance from the United States Supreme Court.

Moreover, the Minnesota Supreme Court, between the majority and concurring opinions, analyzed whether there was a Sixth Amendment public trial right violation using two different approaches that have taken root in American jurisprudence, and, in the end, reached the identical conclusion that no violation occurred. The majority, relying upon *Norris*, found the closure here occurred during an administrative proceeding not subject to the Sixth Amendment. *See United States v. Vazquez-Botet*, 532 F.3d 37 (1st Cir. 2008); *United States v. Valenti*, 987 F.2d 708 (11th Cir. 1993); *United States v. Gurney*, 558 F.2d 1202 (5th Cir. 1977). The concurrence would not have applied the "administrative" label to the closure, but instead would apply a test to determine if the proceeding had similar characteristics to a trial. *See United States v. Thompson*, 713 F.3d 388 (8th Cir. 2013); *Rovinsky v. McKaskle*, 722 F.2d 197 (5th Cir. 1984). Regardless of the analytical framework applied, the majority and concurrence reached the same conclusion: that Smith's Sixth Amendment right was not violated.

III.    **CERTIFICATE OF APPEALABILITY**

Pursuant to Rule 11 of the Rules Governing § 2254 cases, the Court "must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Federal district courts may not grant a certificate of appealability unless the prisoner "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To meet this standard, the petitioner must show "that the issues are debatable among reasonable jurists, a court could resolve the issues differently, or the issues deserve further proceedings." *Flieger v. Delo*, 16 F.3d 878, 882–83 (8th Cir. 1994).

The legal question concerning the courtroom closure in this case is complex and precedent is sparse. "[C]ourtroom closure is to be avoided." *Weaver*, 137 S.Ct. at 1909. But, absent additional guidance from the Supreme Court on the Sixth Amendment, lower courts, both state and federal, have developed varying standards to analyze courtroom closures. *See Irby*, 2016 WL 3255019, at *2. Given these circumstances, it may be debatable among reasonable jurists how the Supreme Court, or the Eighth Circuit, would consider the courtroom closure in Smith's case under the Sixth Amendment. *See id.*

Thus, for purposes of appeal under 28 U.S.C. § 2253, this Court concludes that it is likely that reasonable jurists would find the question of whether to deny Smith's habeas petition debatable depending on the characterization of the closure that occurred in Smith's case, potentially resulting in a different resolution of the issues. Moreover, given the particular importance of the Sixth Amendment's guarantees for a public trial, along with the First Amendment implications of a courtroom closure, especially in "this high-

profile case, which captured the attention of Minnesotans," *Smith*, 876 N.W.2d at 337, this issue deserves further proceedings. Accordingly, this Court recommends that a certificate of appealability issue.

## IV.    RECOMMENDATION

Based on the foregoing, and all the files, records and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1.    The Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody, (ECF No. 4), be **DENIED**.

2.    A certificate of appealability issue.


Date: December 7, 2017                          *s/ Tony N. Leung*
                                                Tony N. Leung
                                                United States Magistrate Judge
                                                District of Minnesota

                                                *Smith v. Smith*
                                                Case No. 17-cv-673 (JRT/TNL)


## NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set for in LR 72.2(c).