# UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

BYRON DAVID SMITH,

Civil No. 17-673 (JRT/TNL)

Petitioner,

v.

**MEMORANDUM OPINION
AND ORDER ADOPTING
REPORT & RECOMMENDATION**

MICHELLE SMITH,
*Warden, MCF - Oak Park Heights*,

Respondent.

Adam T. Johnson, **LUNDGREN & JOHNSON, PSC**, 101 Fifth Street East, Suite 1700, Saint Paul, MN 55101, and Steven J. Meshbesher, **MESHBESHER & ASSOCIATES, PA**, 10 South Fifth Street, Suite 225, Minneapolis, MN 55402, for petitioner.

Brent D. Wartner, **WASHINGTON COUNTY ATTORNEY'S OFFICE**, 15015 Sixty-Second Street North, Post Office Box 6, Stillwater, MN 55082, for respondent.

Byron David Smith is serving two life sentences in a Minnesota state prison for a 2012 double murder in Little Falls, Minnesota. Smith brings this petition for a writ of habeas corpus in federal court, arguing that the Minnesota trial court violated his Sixth Amendment right to a public trial when the trial court closed the courtroom to all spectators and the press for a short period before opening statements were delivered. Smith further argues – pursuant to the requirements of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") – that the Minnesota Supreme Court's decision upholding his conviction was contrary to, and an unreasonable application of, clearly established federal

law.  United States Magistrate Judge Tony N. Leung issued a Report & Recommendation ("R&R"), recommending that the Court deny Smith's petition.  Smith objects to the R&R. Because the Court will conclude that the Minnesota Supreme Court's decision was neither contrary to, nor an unreasonable application of, clearly established federal law, the Court will overrule Smith's objections, adopt the R&R, and deny Smith's petition.

## BACKGROUND

On Thanksgiving Day 2012, Byron Smith shot and killed two teenagers who had broken into his home:  Nicholas Brady and Haile Kifer.  *State v. Smith*, 876 N.W.2d 310, 317 (Minn. 2016).  Smith was convicted of two counts of first-degree murder in Minnesota state court.  *Id.* at 321.  At trial, Smith maintained that the shootings were a justified act of self-defense.  *Id.*  To support his argument, Smith sought to introduce evidence that Brady had been involved in several prior burglaries of Smith's home.  *Id.* at 327.  Specifically, Smith sought to call three witnesses to testify about Brady's alleged involvement:  Brady's mother and two of Brady's friends who were also allegedly involved in the prior burglaries, J.K. and C.K.  *Id.*

The trial court permitted Smith to introduce evidence of prior burglaries of his home via the testimony of law-enforcement agents.  *Id.* at 328.  But the court prohibited Smith from introducing evidence that Brady was associated with the prior burglaries because Smith had not known of Brady's involvement at the time of the shootings.  *Id.*  The trial court's ruling came in 2014 after two public hearings, held on March 25 and April 17, on

the subject. *Id.* The first public hearing resulted in a public order dated April 4. *Id.* at 330.

In that April 4 order, the court reasoned that the prior burglaries

> "strike directly at the reasonableness of [Smith's] decisions in
> defending his person and his dwelling. . . ." However, the fact
> that it may have been Nicholas Brady who was involved in the
> previous burglaries contributes nothing to [Smith's] argument,
> for the reasonableness of [Smith's] action and judgment must
> be determined by his state of mind at the time of the shooting,
> not by what was learned after the event.

(Pet. Ex. 1 at 7, Mar. 3, 2017, Docket No. 5.) The April 4 order did not discuss whether

Smith could call J.K. and C.K. as witnesses. (*See id.* at 6-7) At the April 17 public hearing,

Smith's counsel "discussed Brady's alleged co-participants [J.K. and C.K.] by name."

*Smith*, 876 N.W.2d at 327.

Smith's trial was a "high-profile case, which captured the attention of Minnesotans

because of its unusual facts and the deaths of two teenagers." *Id.* at 337 (Stras, J.,

concurring). On the morning of April 21 – the day that opening statements were to be

delivered and after the jury had been selected – Smith's case was called, and the trial court

then cleared all spectators and the press from the courtroom. (*See* Resp't Ex. C at 4, Mar.

31, 2017, Docket No. 12; *Smith*, 876 N.W.2d at 327-28 (majority opinion).) Smith's

counsel objected to this courtroom closure.

> Your Honor, this is a - - I thought about the court's suggestion,
> and I would ask the court to reconsider. This is a public
> facility. Mr. Smith is on trial in a public courtroom, and I ask
> to allow any of the public to be allowed to be present, including
> media, if they choose. To not allow that would infringe upon
> the freedom of the public to be present as well as free press.
> He has that right to a public trial.

(Resp't Ex. C at 4:11-19.) The court overruled Smith's objection and kept the courtroom closed so that the court could explain to the parties and counsel the scope of the court's evidentiary ruling, including that there was to be no mention of J.K. or C.K. by name.

> And the pretrial ruling of the court was that the defense had given notice that it . . . wants to offer testimony from [J.K.] and [C.K.] about their involvement in prior burglaries which, of course, would have involved Nick Brady as well a co-perpetrator. And the court has ruled the . . . defendant will not disclose the names of [J.K., C.K.] or Brady involved in prior burglaries . . . .

(*Id.* at 4:20-5:6.) The court then explained its reasons for closing the courtroom:

> And for that reason -- that was the reason that the court is not allowing the press in for this ruling, because otherwise it could be printed, and indeed, while the jurors hopefully will follow the admonition not to read or hear anything in the press and TV and such in the meantime while this case is pending, certainly the media would publish and print the substance of the court's pretrial ruling, and then of course it runs the risk of getting to the jury if for some reason they don't adhere to their oath.

(*Id.* at 6:4-14.)

Immediately after the closure, the court filed a second public order, "reiterat[ing] that evidence of prior bad acts by Nicholas Brady or Haile Kifer, of which [Smith] was unaware at the time of the shooting, shall be inadmissible at trial," and that while evidence of the prior burglaries "may be received through the testimony of . . . law enforcement agents, there will be no need to seek its admission through more prejudicial means (*i.e.*, through the testimony of Brady's mother or of a perpetrator of the prior break-ins)." (Pet. Ex. 2 at 1, 3, Mar. 3, 2017, Docket No. 6; *see also Smith*, 876 N.W.2d at 328.) Three minutes after the court filed this second order, the court reopened the courtroom, swore in

-4-

the jury, gave preliminary instructions, and the parties then gave their opening statements. (Resp't Ex. C at 8-9; *Smith*, 876 N.W.2d at 328.)

The jury found Smith guilty of murder, and the trial court sentenced him to two life sentences. *Smith*, 876 N.W.2d at 321. Smith appealed his conviction, arguing that the trial court's closure violated his Sixth Amendment right to a public trial. *Id.* at 327. The Minnesota Supreme Court upheld his conviction, finding that the closure did not implicate Smith's Sixth Amendment right because the closure was "administrative" in nature. *Id.* at 327-30.[1]

This habeas petition in federal court followed.

## DISCUSSION

## I. STANDARD OF REVIEW

Upon the filing of a report and recommendation by a magistrate judge, a party may "serve and file specific written objections to the proposed findings and recommendations." Fed. R. Civ. P. 72(b)(2); *accord* D. Minn. LR 72.2(b)(1). "The district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to." Fed. R. Civ. P. 72(b)(3).

---

[1] Smith thus exhausted his state-court remedies. *See* Minn. Stat. § 590.01, subd. 1.

## II.    AEDPA

AEDPA governs the Court's review of Smith's habeas petition.  28 U.S.C. § 2254.

Habeas review is narrow and is "limited to deciding whether a conviction violated the

Constitution, laws, or treaties of the United States."  *Estelle v. McGuire*, 502 U.S. 62, 68

(1991); *see also* 28 U.S.C. § 2254(a) ("[A] district court shall entertain an application for

a writ of habeas corpus . . . only on the ground that [the petitioner] is in custody in violation

of the Constitution or laws or treaties of the United States.").

For federal claims adjudicated during a petitioner's state-court proceedings,

AEDPA is "highly deferential" to the state court's decision on that federal claim.  *Davis v.

Ayala*, 135 S. Ct. 2187, 2198 (2015).  AEDPA provides:

> An application for a writ of habeas corpus on behalf of a person
> in custody pursuant to the judgment of a State court shall not
> be granted with respect to any claim that was adjudicated on
> the merits in State court proceedings unless the adjudication of
> the claim . . . resulted in a decision that was contrary to, or
> involved an unreasonable application of, clearly established
> Federal law, as determined by the Supreme Court of the United
> States.

28 U.S.C. § 2254(d)(1).[2]  AEDPA "was intended to be difficult to meet and only authorizes

a federal habeas court to issue the writ in cases where 'there is no possibility fairminded

jurists could disagree that the state court's decision conflicts with [the Supreme Court's]

_____

[2] Smith does not argue that he is entitled to relief under § 2254(d)(2), i.e., that the state court's decision was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  Instead, Smith argues only that he is entitled to relief under § 2254(d)(1).

*(footnote continued on next page)*

precedents.'" *Shelton v. Mapes*, 821 F.3d 941, 949 (8th Cir. 2016) (alteration in original) (quoting *Harrington v. Richter*, 562 U.S. 86, 102 (2011)).[3] AEDPA's highly deferential scheme necessarily means that some constitutional violations will go unremedied, in favor of "promoting 'comity, finality, and federalism.'" *Carey v. Saffold*, 536 U.S. 214, 220 (2002) (quoting *Williams v. Taylor*, 529 U.S. 420, 436 (2000)).

The phrase "clearly established Federal law, as determined by the Supreme Court of the United States" in § 2254(d)(1), "refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Williams*, 529 U.S. at 412. And the Supreme Court has cautioned lower courts against "framing [its] precedents at . . . a high level of generality." *Nevada v. Jackson*, 569 U.S. 505, 512 (2013).

"A state court decision is 'contrary to' clearly-established federal law if the state court arrives at a conclusion opposite to that reached by the United States Supreme Court on a question of law." *Davis v. Grandlienard*, 828 F.3d 658, 666 (8th Cir. 2016) (citing *Williams*, 529 U.S. at 405).[4] "A state-court decision will certainly be contrary to [the Supreme Court's] clearly established precedent if the state court applies a rule that

---

[3] This opinion uses "Supreme Court" to refer to the Supreme Court of the United States, in contrast to "Minnesota Supreme Court."

[4] A state-court decision can also be "contrary to" clearly established federal law "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [Supreme Court] precedent." *Williams*, 529 U.S. at 406. Smith does not argue that his case involves facts materially indistinguishable from a decision of the Supreme Court.

contradicts the governing law set forth in [the Supreme Court's] cases." *Williams*, 529

U.S. at 405. "A state court's decision is not 'contrary to . . . clearly established Federal

law' simply because the [state] court did not cite [Supreme Court] opinions," *Mitchell v.*

*Esparza*, 540 U.S. 12, 16 (2003) (per curiam) (omission in original) (quoting *Early v.*

*Packer*, 537 U.S. 3, 8 (2002)), or simply because the state-court decision "relied heavily

on its own precedent," *Davis*, 828 F.3d at 666.

"An 'unreasonable application' of Supreme Court precedent occurs when a state

court correctly identifies the governing legal standard but either unreasonably applies it to

the facts of the particular case or unreasonably extends or refuses to extend the legal

standard to a new context." *Munt v. Grandlienard*, 829 F.3d 610, 614 (8th Cir. 2016) (citing

*Williams*, 529 U.S. at 407). AEDPA's "'unreasonable application' clause requires the state

court decision to be 'objectively unreasonable,' which demands the decision be more than

incorrect or erroneous." *Davis*, 828 F.3d at 666 (quoting *Lockyer v. Andrade*, 538 U.S. 63,

75 (2003)). "The 'objectively unreasonable' standard is not satisfied even by clear error."

*Id.*

If a state-court decision is contrary to or an unreasonable application of clearly

established federal law, "[a] federal court must then resolve the claim without the deference

AEDPA otherwise requires." *Panetti v. Quarterman*, 551 U.S. 930, 953 (2007); *see Lafler*

*v. Cooper*, 566 U.S. 156, 173 (2012).

## III. SIXTH AMENDMENT RIGHT TO A PUBLIC TRIAL

"In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial." U.S. Const. Amend. VI. The right to a public trial applies in both state and federal court, *In re Oliver*, 333 U.S. 257, 273 (1948), and it "extends beyond the actual proof at trial," *Presley v. Georgia*, 558 U.S. 209, 212 (2010) (per curiam). It applies – at a minimum – to voir dire of prospective jurors and to pretrial hearings on motions to suppress evidence. *Id.* at 213; *Waller v. Georgia*, 467 U.S. 39, 43 (1984).

"[T]he public-trial guarantee [is] . . . for the benefit of the defendant." *Gannett Co. v. DePasquale*, 443 U.S. 368, 380 (1979). It "encourages witnesses to come forward and discourages perjury," keeps the jury "keenly alive to a sense of their responsibility and to the importance of their functions," ensures "that judge and prosecutor carry out their duties responsibly," and ensures that the defendant is "fairly dealt with and not unjustly condemned." *Waller*, 467 U.S. at 47. "The value of openness lies in the fact that people not actually attending trials can have confidence that standards of fairness are being observed; the sure knowledge that anyone is free to attend gives assurance that established procedures are being followed and that deviations will become known." *Press-Enter. Co. v. Superior Court of Cal., Riverside Cty.*, 464 U.S. 501, 508 (1984).[5] "Essentially, the public-trial guarantee embodies a view of human nature, true as a general rule, that judges,

---

[5] Although *Press-Enterprise* is a First Amendment case, the Supreme Court has incorporated *Press-Enterprise* into its Sixth Amendment jurisprudence. *See Waller*, 467 U.S. at 46.

lawyers, witnesses, and jurors will perform their respective functions more responsibly in an open court than in secret proceedings." *Estes v. Texas*, 381 U.S. 532, 588 (1965) (Harlan, J., concurring).

The public-trial right is not absolute. It "may give way in certain cases." *Waller*, 467 U.S. at 45. "Closed proceedings, although not absolutely precluded, must be rare and only for cause shown that outweighs the value of openness." *Press-Enter.*, 464 U.S. at 509. Courts must take "special care" in those instances. *Waller*, 467 U.S. at 45. In *Waller*, the Supreme Court set out a four-factor test that a trial court must find satisfied before closing the courtroom to the public:

> [1] [T]he party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, [2] the closure must be no broader than necessary to protect that interest, [3] the trial court must consider reasonable alternatives to closing the proceeding, and [4] it must make findings adequate to support the closure.

467 U.S. at 48 (adopting the *Press-Enterprise* factors for Sixth Amendment analysis). And in *Presley*, the Supreme Court – in summarily reversing the Supreme Court of Georgia – stated that trial courts must apply the four-factor *Waller* test "before excluding the public from any stage of a criminal trial." 558 U.S. at 213-14.

## IV.   SMITH'S PETITION

Smith argues that the Minnesota Supreme Court's decision concluding that the trial court did not violate his Sixth Amendment right to a public trial was contrary to, and involved an unreasonable application of, clearly established federal law.

## A.      Clearly Established Federal Law

At the time of the Minnesota Supreme Court's decision in Smith's case, there were two leading decisions from the Supreme Court regarding a criminal defendant's Sixth Amendment right to a public trial:  *Waller v. Georgia*, 467 U.S. 39 (1984), and *Presley v. Georgia*, 558 U.S. 209 (2010).[6]

It is clearly established that – and the Minnesota Supreme Court acknowledged that – a courtroom closure must satisfy the four-factor test from *Waller* to not infringe on a criminal defendant's Sixth Amendment right to a public trial.  *Smith*, 876 N.W.2d at 329 (citing *Waller*, 467 U.S. at 48).  It is also clearly established that the right to a public trial can be implicated in proceedings outside the presentation of evidence and argument to the jury.  *United States v. Thompson*, 713 F.3d 388, 392 (8th Cir. 2013) ("[I]t is clearly established that the public trial right extends beyond actual proof at trial.").  The Minnesota Supreme Court acknowledged the temporal breadth of the public-trial right, noting that it "applies to all phases of trial," "encompass[ing] preliminary hearings, voir dire, witness testimony, closing arguments, jury instructions, and returning of the verdict."  *Smith*, 876 N.W.2d at 328-29 (citations omitted).

---

[6] *Weaver v. Massachusetts*, 137 S. Ct. 1899 (2017), partially concerns a criminal defendant's Sixth Amendment right to a public trial.  But the Supreme Court issued *Weaver* after the Minnesota Supreme Court issued the decision that Smith challenges here.  Thus, the Court does not consider *Weaver* in the determination of what law was clearly established at the time of the Minnesota Supreme Court's decision.  *See Williams*, 529 U.S. at 412.

## B. "Contrary to" Clearly Established Federal Law

Smith argues that the Minnesota Supreme Court's decision is contrary to clearly established federal law because the Minnesota Supreme Court applied the incorrect legal rule to Smith's claim.

### 1. The Rule Applied by the Minnesota Supreme Court

Before the Court can determine whether the Minnesota Supreme Court applied a rule that contradicts the Supreme Court's governing law on the right to a public trial, the Court must first determine what rule of law the Minnesota Supreme Court applied.

After generally describing the public-trial right and the four-factor *Waller* test, the Minnesota Supreme Court stated:

> However, "before we can apply the *Waller* test to determine if a closure is justified, we must determine whether a [Sixth Amendment] closure even occurred." We have previously recognized that "the right to a public trial is not an absolute right." Some situations warrant restrictions on public access, and other courtroom restrictions do not implicate a defendant's right to a public trial. In *Lindsey*, for example, we determined that some closures are "'too trivial to amount to a violation of the [Sixth] Amendment.'" Other nonpublic proceedings simply may not implicate the Sixth Amendment right to a public trial, depending on the nature of the proceeding.

*Smith*, 876 N.W.2d at 329 (alterations in original) (citations omitted).[7]  The court then went

on to describe when, in its view, certain proceedings are not subject to the Sixth

Amendment public-trial right.

> [C]ourts have distinguished suppression hearings from other
> "administrative" proceedings that do not implicate the Sixth
> Amendment right to a public trial.  Contrary to what the
> "administrative" label suggests, such proceedings are not
> limited to purely administrative procedures before the court,
> such as scheduling.  Instead, courts have also treated routine
> evidentiary rulings and matters traditionally addressed during
> private bench conferences or conferences in chambers as
> routine administrative proceedings.  It is the type of
> proceeding, not the location of the proceeding, that is
> determinative.
>
> In administrative proceedings, "[n]on-public exchanges
> between counsel and the court on such technical legal issues
> and routine administrative problems do not hinder the
> objectives which the Court in *Waller* observed were fostered
> by public trials."  In contrast to a suppression hearing, these
> administrative exchanges "ordinarily relate to the application
> of legal principles to admitted or assumed facts so that no fact
> finding function is implicated.  A routine evidentiary ruling is
> rarely determinative of the accused's guilt or innocence."
> Additionally, "such evidentiary rulings ordinarily pose no

---

[7] The Minnesota Supreme Court was clear that, during Smith's trial, the courtroom was **physically** closed.  The trial court cleared the courtroom of all spectators, including the media.  It was a total and complete closure of the courtroom.  *Smith*, 876 N.W.2d at 327 ("The court then closed the courtroom to all except the attorneys, the defendant, and court staff.").  Although the Minnesota Supreme Court stated that no "closure" occurred, that phrasing describes its holding that the closed proceeding during Smith's trial was not subject to the protection of the public-trial right, not that the courtroom was not physically closed.  Additionally, Smith's case does not involve a "partial" closure.  *See generally United States v. Simmons*, 797 F.3d 409, 413 (6th Cir. 2015) ("Nearly all federal courts of appeals . . . have distinguished between the total closure of proceedings and situations in which a courtroom is only partially closed to certain spectators."); *Thompson*, 713 F.3d at 394-96 ("Whether a closure is total or partial . . . depends not on how long a trial is closed, but rather who is excluded . . . .").

*(footnote continued on next page)*

threat of judicial, prosecutorial, or public abuse that a public trial is designed to protect against."

Thus, courts have allowed nonpublic proceedings for evidence-related proceedings such as: deciding whether a witness will testify under threat of contempt; determining the scope of witness immunity; sidebar conferences on evidentiary rulings; and consideration of offers of proof. We, too, have distinguished between the key phases of trial, on the one hand, and the concept of bench and chambers conferences, on the other. We have held that bench and chambers conferences may occur, so long as a record is made and the record is available to the press and the public.[8]

In articulating its rule, the Minnesota Supreme Court relied on the "triviality" exception, which Minnesota adopted in 2001. *Smith*, 876 N.W.2d at 329 (citing *State v. Lindsey*, 632 N.W.2d 652, 660-61 (Minn. 2001)). The triviality exception grew out of *Peterson v. Williams*, 85 F.3d 39 (2d Cir. 1996),[9] and its application in Minnesota results in a holding of no public-trial violation for a courtroom closure if "the values sought to be

---

[8] *Smith*, 876 N.W.2d at 329-30 (citations omitted) (citing *United States v. Vázquez-Botet*, 532 F.3d 37, 51-52 (1st Cir. 2008); *Peterson v. Williams*, 85 F.3d 39, 42 (2d Cir. 1996); *United States v. Norris*, 780 F.2d 1207, 1209-11 (5th Cir. 1986); *State v. Reed*, 352 P.3d 530, 534-35, 542 (Kan. 2015); *State v. Taylor*, 869 N.W.2d 1, 11 (Minn. 2015); ; *State v. Brown*, 815 N.W.2d 609, 616 (Minn. 2012); *State v. Everson*, 749 N.W.2d 340, 352 (Minn. 2008); *State v. Lindsey*, 632 N.W.2d 652, 660-61 (Minn. 2001); *State v. Fageroos*, 531 N.W.2d 199, 201 (Minn. 1995); *Minneapolis Star & Tribune Co. v. Kammeyer*, 341 N.W.2d 550, 560 (Minn. 1983); *State v. Hicks*, 837 N.W.2d 51, 60-61 (Minn. App. 2013), *aff'd on other grounds*, 864 N.W.2d 153 (Minn. 2015); *People v. Olivero*, 735 N.Y.S.2d 327, 328 (N.Y. App. Div. 2001); *State v. Smith*, 334 P.3d 1049, 1052-55 (Wash. 2014)).

[9] *Peterson* was decided after *Waller*, but before *Presley*.

*(footnote continued on next page)*

protected by a public trial were in fact protected." *Lindsey*, 632 N.W.2d at 661.[10]

Minnesota sometimes refers to these closures as not being "true" closures. *Id.* at 660. And

Minnesota courts consider four factors (distinct from the *Waller* factors) in determining

whether a closure is "too trivial to implicate the Sixth Amendment," *State v. Zornes*, 831

N.W.2d 609, 620 (Minn. 2013), or whether the closure is a "true closure," *State v. Taylor*,

869 N.W.2d 1, 11 (Minn. 2015). Those factors are (1) whether the courtroom was ever

"cleared of all spectators"; (2) whether the trial "remained open to the general public and

the press"; (3) whether there was any "period of the trial in which members of the general

public were absent during the trial";[11] and (4) whether the defendant, his or her family or

friends, or any witness was at any time improperly excluded. *Zornes*, 831 N.W.2d at 620

(citing *Lindsey*, 632 N.W.2d at 661.)

But the Minnesota Supreme Court did not apply the triviality exception to the

closure in Smith's case to find that no constitutional violation occurred. Rather, the court

applied its rule that the Sixth Amendment public-trial right categorically does not apply to

"administrative" proceedings. *Smith*, 876 N.W.2d at 329. According to the Minnesota

Supreme Court, the public-trial right does not attach to certain proceedings during a

---

[10] The closure in *Lindsey* was not a total closure. 632 N.W.2d at 661 ("At no time was the courtroom cleared of all spectators.")

[11] The relevance of this third factor – whether any members of the public actually attended – is unclear. After all, part of the benefit of a public trial is that "the sure knowledge that anyone is free to attend gives assurance that established procedures are being followed and that deviations will become known." *Press-Enter.*, 464 U.S. at 508.

criminal trial, "depending on the nature of the proceeding." *Id.* In deciding whether a proceeding is "administrative," according to the court, relevant characteristics of the proceeding include whether it involved "exchanges between counsel and the court on . . . technical legal issues"; whether a "fact finding function is implicated" by the proceeding; and whether it is "determinative of the accused's guilt or innocence." *Id.* at 329-30. The Minnesota Supreme Court then noted that other courts "have allowed nonpublic proceedings for evidence-related proceedings." *Id.* at 330.[12]

### 2. Whether the Minnesota Supreme Court's Decision is Contrary to Clearly Established Federal Law

This Court has great difficulty squaring the Minnesota Supreme Court's rule – and the triviality exception on which it relies – with the clearly established federal law of the Supreme Court of the United States.

First, the triviality exception is inconsistent with both *Waller* and *Presley*.[13] *Waller* holds that the Sixth Amendment right to a public trial applies to a suppression hearing and

---

[12] The Minnesota Supreme Court also noted that it has allowed nonpublic "bench and chambers conferences . . ., so long as a record is made and the record is available to the press and the public." *Smith*, 876 N.W.2d at 330 & n.7 (discussing two First Amendment challenges to closures). This public-record requirement is understandable in the First Amendment context, but curious in the Sixth Amendment context because the Minnesota Supreme Court's rule is that the Sixth Amendment right categorically does not apply to these "administrative" proceedings. Moreover, a criminal defendant often consents to nonpublic bench and chambers conferences. *See, e.g.*, *State v. Benton*, 858 N.W.2d 535, 539-41 (Minn. 2015); *see also Waller*, 467 U.S. at 47 (holding the public-trial right applies to suppression hearings closed "over the objections of the accused"). Here, however, Smith objected.

[13] The Eighth Circuit has not adopted the triviality exception. *See United States v. Thunder*, 438 F.3d 866, 867-68 (8th Cir. 2006) ("To withstand a defendant's objection to closing a trial **or**
*(footnote continued on next page)*

-16-

that "any closure of a suppression hearing over the objections of the accused must meet the tests set out in *Press-Enterprise* and its predecessors." 467 U.S. at 43, 47. The *Waller* Court then articulated the four-factor test that "**any closure** . . . must meet." *Id.* at 47-48 (emphasis added). Although the Supreme Court has never considered the triviality exception, for a court to determine whether a closure was "trivial" by considering "how seriously the values served by the Sixth Amendment were undermined," *Peterson*, 85 F.3d at 43, is misaligned with *Waller*'s holding: that the *Waller* four-factor test applies to "any closure." 467 U.S. at 47. *Presley* reiterated this point: "*Waller* provided standards for courts to apply before excluding the public from **any stage** of a criminal trial." 558 U.S. at 213 (emphasis added); *see also Press-Enter.*, 464 U.S. at 509 ("Closed **proceedings** . . . must be rare and only for cause shown that outweighs the value of openness." (emphasis added)). *Presley* also holds that trial courts must "consider alternatives to closure even when they are not offered by the parties," and that the trial court's *Waller* analysis "must 'be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered.'" *Id.* at 214-15 (quoting *Press-Enter.*, 464 U.S. at 510). For a reviewing court to determine that a trial court's closure was "trivial" and thus constitutional – without reviewing the trial court's *Waller* analysis (if any was performed) – runs counter to *Presley*.

---

**any part of one**, an order directing closure must adhere to the principles outlined in *Press-Enterprise* . . . ." (emphasis added)); *see also Thompson*, 713 F.3d at 394-96.

Further undermining the validity of the triviality exception is its striking similarity to the pre-*Crawford* test for violations of the Confrontation Clause (another Sixth Amendment right), which the Supreme Court rejected over a decade ago. In *Crawford v. Washington*, 541 U.S. 36 (2004), the Supreme Court held that the right of confrontation (and thus the right to cross examination) unequivocally applies to "testimonial" statements, rejecting the view that the right of confrontation is satisfied if a statement has "adequate 'indicia of reliability.'" 541 U.S. at 68-69 (overruling *Ohio v. Roberts*, 448 U.S. 56 (1980)). The proper constitutional inquiry, said the Supreme Court, was into the nature of the statement made, not its reliability.

> Admitting statements deemed reliable by a judge is fundamentally at odds with the right of confrontation. To be sure, the [Confrontation] Clause's ultimate goal is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee. It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination. The Clause thus reflects a judgment, not only about the desirability of reliable evidence (a point on which there could be little dissent), but about how reliability can best be determined.

*Id.* at 61. The evolution of the triviality exception closely parallels the now-overruled, pre-*Crawford* "adequate indicia of reliability" test. Pre-*Crawford*, courts looked to the "values" that the right of confrontation was designed to protect: namely, reliability. *Roberts*, 448 U.S. at 66 (quoting *California v. Green*, 399 U.S. 149, 155 (1970)). Likewise, courts applying the triviality exception look to the "values furthered by the public trial guarantee." *Peterson*, 85 F.3d at 43. But looking to the purposes or values of a categorical constitutional right – rather than to the right itself – "replaces the constitutionally

prescribed method . . . with a wholly foreign one." *Crawford*, 541 U.S. at 62. "It is not enough to point out that most of the usual safeguards" are present "when the single safeguard missing is the one the [Constitution] demands." *Id.* at 65. In articulating the right of confrontation as categorical, *Crawford* relied on the fact that the Confrontation Clause constrains judges – not just prosecutors. *See id.* at 67-68. So too does the public-trial right constrain judges. *Waller*, 467 U.S. at 46, 47 n.4. Logically, then, one might expect (or at least hope) that the public-trial right also be categorical, i.e., that it not be subject to judicial value-weighing. In light of *Waller* and *Presley* – and informed by *Crawford*'s rationale – the Court seriously questions whether the triviality exception conforms with the Sixth Amendment.

Second, the Minnesota Supreme Court's rule that "administrative" proceedings during a criminal trial are not subject to the public-trial right also is inconsistent with *Waller* and *Presley*. A trial court must apply the four-factor *Waller* test "before excluding the public from any stage of a criminal trial." *Presley*, 558 U.S. at 213. A comparison of the Minnesota Supreme Court's rule (that "administrative" proceedings are not subject to the public-trial right) to the proceedings at issue in *Waller* and *Presley* casts serious doubt on the constitutionality of the Minnesota Supreme Court's rule. *Waller* involved a suppression hearing; *Presley* involved voir dire. To use the Minnesota Supreme Court's own language of what makes a proceeding "administrative," a suppression hearing is "evidentiary" and can potentially involve "exchanges between counsel and the court on . . . technical legal issues"; and voir dire implicates no "fact finding function" and is in no way "determinative of the accused's guilt or innocence." *See Smith*, 876 N.W.2d at 329-30.

That the Minnesota Supreme Court's rule could arguably be stretched to support finding a suppression hearing and voir dire outside the scope of the public-trial right – which would obviously be directly contrary to the Supreme Court's clearly established precedent – suggests that the Minnesota Supreme Court's rule is not in line with Supreme Court law.

In determining whether the Minnesota Supreme Court applied the incorrect rule of law, the Supreme Court's decision in *Williams v. Taylor*, 529 U.S. 362, is informative. There, the Supreme Court held that the Virginia Supreme Court acted contrary to clearly established federal law when the Virginia Supreme Court failed to apply the test from *Strickland v. Washington*, 466 U.S. 668 (1984), in determining whether a criminal defendant was prejudiced by allegedly ineffective assistance of counsel. *Williams*, 529 U.S. at 391. The *Strickland* test asks whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Williams*, 529 U.S. at 391 (quoting *Strickland*, 466 U.S. at 694). But the Virginia Supreme Court evaluated whether the defendant's trial was "fundamentally unfair," a higher standard for the defendant to meet. *Id.* at 392-97. The Supreme Court held that Virginia's failure to apply the proper test from *Strickland* was, under AEDPA, contrary to clearly established federal law. *Id.* at 399; *see also Lafler*, 566 U.S. at 173 (finding a state-court decision contrary to clearly established federal law for failing to apply *Strickland* to a defendant's ineffective-assistance-of-counsel claim).

Also instructive is the Third Circuit's recent decision in *Tucker v. Superintendent Graterford SCI*, 677 F. App'x 768 (3d Cir. 2017). There, the court concluded that the Pennsylvania Supreme Court acted contrary to clearly established federal law when it

failed to apply the *Waller* test to a courtroom closure that occurred during the defendant's trial. *Id.* at 774-76.[14] Instead of *Waller*, the Pennsylvania Supreme Court applied a "less rigorous standard" based on its own precedent – that "trial courts . . . may always place reasonable restrictions on access to the courtroom, so long as the basic guarantees of fairness are preserved." *Id.* at 775 (quoting *Commonwealth v. Berrigan*, 501 A.2d 226, 234 (Pa. 1985)). Like the Supreme Court in *Williams*, the Third Circuit in *Tucker* held that Pennsylvania's failure to apply the *Waller* test was, under AEDPA, contrary to clearly established federal law. *Id.* at 776 ("The standard articulated in *Berrigan* that allows 'reasonable restrictions' on public access to the courtroom is inconsistent with the narrow tailoring required by *Waller*.").

Nevertheless, the Court cannot conclude that the rule the Minnesota Supreme Court applied in Smith's case was contrary to clearly established federal law; although the Minnesota Supreme Court comes extremely close to applying a rule contrary to clearly established federal law. Similar to the Virginia Supreme Court in *Williams*, the Minnesota Supreme Court here failed to apply the Supreme Court's *Waller* test to the closure during Smith's trial. *See Smith*, 876 N.W.2d at 330. Instead, the Minnesota Supreme Court, applying mostly its own precedent, evaluated the nature of the proceeding, i.e., whether it

---

[14] Tucker's case involved a total/complete closure. "[T]he trial judge chose to close the courtroom during the testimony of all witnesses, including the six law enforcement officers who testified, and to all members of the public, save for a detective and a group of students, who were in attendance at the request of a friend of the trial judge." *Tucker*, 677 F. App'x at 775 n.9.

was "administrative," such that Smith's right to a public trial was not implicated.  *Id.* at 328-30.

But the obstacle for Smith – and ultimately, the Court – is twofold:  the scarcity of Supreme Court law on the public-trial right, and the abundance of Supreme Court law  on AEDPA.  *Waller* and *Presley* are the only two Supreme Court decisions that clearly address the scope of the Sixth Amendment right to a public trial.  And while each clearly held that the public-trial right applies to a particular proceeding outside the presentation of evidence and argument to the jury, the holdings of *Waller* and *Presley* do not categorically foreclose the Minnesota Supreme Court's rule.  The Supreme Court has repeatedly directed lower courts to look only to the Supreme Court's holdings, not dicta, in determining what law is clearly established.  *Williams*, 529 U.S. at 412.  It has instructed lower courts to avoid framing its cases at a "high level of generality."  *Jackson*, 569 U.S. at 512.  And a state-court decision is not contrary to clearly established federal law because the state court fails to cite Supreme Court cases or relies on state-court precedent.  *Mitchell*, 540 U.S. at 16; *Davis*, 828 F.3d at 666.  For this Court to conclude that the Minnesota Supreme Court's rule is contrary to clearly established federal law would require the Court to read too much into the phrases "any closure" from *Waller*, "every stage" from *Presley*, and "closed proceedings" from *Press-Enterprise*.  Under AEDPA's highly deferential standard, the Court must conclude that the Minnesota Supreme Court's decision is not contrary to clearly established federal law.

## C.    "Unreasonable Application of" Clearly Established Federal Law

Smith also argues that the Minnesota Supreme Court's decision is an unreasonable application of clearly established federal law because the Minnesota Supreme Court recognized *Waller* as binding but failed to apply it to the closure during Smith's trial.  For the same reasons that the Minnesota Supreme Court's decision comes close to being contrary to clearly established federal law, its decision comes equally close to unreasonably applying clearly established federal law by failing to apply *Waller* in the first place.  *See Williams*, 529 U.S. at 397 (holding that a state-court decision is an "unreasonable application" of clearly established federal law for the same reasons that it is "contrary to" clearly established federal law).

But assuming that the triviality exception and the Minnesota Supreme Court's rule regarding "administrative" proceedings are not incorrect legal principles, this Court cannot conclude that the Minnesota Supreme Court's application of its rule to Smith's case is objectively unreasonable.    The closed proceeding during Smith's trial concerned "evidentiary boundaries, similar to what would ordinarily and regularly be discussed in chambers or at a sidebar conference," "it was transcribed, and it consumed only two-tenths of one percent of the trial transcript."  *Smith*, 876 N.W.2d at 330.  It was not objectively

unreasonable for the Minnesota Supreme Court to conclude (under its rule) that the proceeding was "administrative," and thus outside the Sixth Amendment's protection.[15]

### D. Application of the *Waller* Test

The Minnesota Supreme Court did not apply *Waller*'s four-factor test to the closure during Smith's trial. *See id.* at 329. However, then-Justice Stras, concurring in the judgment, concluded that "there is little doubt that the closure would fail" *Waller*. *Id.* at 341 (Stras, J., concurring). The Magistrate Judge likewise found that the trial court's closure would be unconstitutional under *Waller*, (R&R at 17-19), and no objections were made by either party to that portion of the R&R.

The Court has little difficulty concluding that the trial court's sua sponte closure during Smith's trial fails the *Waller* test.[16] First, the trial court did not consider "reasonable alternatives" to a complete and total closure of the courtroom. *See Waller*, 467 U.S. at 48. Second, "the trial court's sole articulated reason was speculative," (R&R at 17), i.e.,

---

[15] The Magistrate Judge noted that the parties dispute the "characterization of the closure as occurring during a pretrial proceeding," but that "the timing of the closure is undisputed." (R&R at 16.) The Magistrate Judge then concluded that "the Minnesota Supreme Court's conclusion that the closure occurred during a pretrial proceeding" was a factual finding by a state court that a federal court must "presume to be correct." (*Id.* at 16-17 (citing 28 U.S.C. § 2254(e)(1)).) The Court rejects this portion of the R&R. The Minnesota Supreme Court did not find, as a factual matter, that the closure occurred during a "pretrial" proceeding. *See Smith*, 876 N.W.2d at 327 (calling the closed proceeding a "sequel" to the trial court's "pretrial" ruling). The Minnesota Supreme Court simply held, as a matter of law, that Smith's public-trial right did not apply to the proceeding. *See Miller-El v. Cockrell*, 537 U.S. 322, 341 (2003) ("[S]ubsection [2254(e)(1)] pertains only to state-court determinations of factual issues, rather than decisions.")

[16] Indeed, the Minnesota Supreme Court majority stated: "[W]e do not understand the [trial] court's rationale for closing the proceeding to the public." *Smith*, 876 N.W.2d at 330 n.8.

"because otherwise [information] **could** be printed, and indeed, while the jurors **hopefully** will follow the admonition not to read or hear anything in the press . . . of course it **runs the risk** of getting to the jury if **for some reason** they don't adhere to their oath." (Resp't Ex. C at 6:4-14 (emphases added).) Fear that jurors might disregard trial courts' admonitions, if blindly accepted, could justify myriad courtroom closures – indeed, practically any. *Smith*, 876 N.W.2d at 340 (Stras, J., concurring). Third, the trial court's reasoning was backwards: fear that the media might report the substance of a proceeding "should weigh in favor of keeping the courtroom doors open, not against it." *Id.* Fourth, the trial court did not make the necessary findings on the record before closing the courtroom. *See Presley*, 558 U.S. at 214-15. This point bears repeating: *Waller* findings must be made **before** closing the courtroom so that "a reviewing court can determine whether the closure . . . was proper[]." *Id.* at 215 (quoting *Press-Enter.*, 464 U.S. at 510). Here, that purpose is front-and-center: every court to review the Minnesota trial court's closure cannot make sense of it. *Smith*, 876 N.W.2d at 330 n.8; (R&R at 17-19). The trial court might have had a legitimate concern that was more apparent to it at the time (presiding over the entire trial) than to a reviewing court later (having only the written record). And fifth, the information that "the [trial] court sought to prevent from spreading to the jurors [was] already . . . public." (R&R at 18.) On this record, the Court is at a loss to understand why the trial court thought that the closure would serve any purpose, much less that the closure was "no broader than necessary" to "advance an overriding interest." *Waller*, 467 U.S. at 48.

The closure during Smith's trial is part of a broader and disturbing trend – that Minnesota courts are restricting public access to criminal trials more frequently and with greater severity. Minnesota trial courts may exclude children under the age of 17 from an entire criminal trial, *Lindsey*, 632 N.W.2d at 657, 660-61 (applying Minn. Stat. § 631.04); they may lock the courtroom doors during jury instructions and closing arguments, *State v. Silvernail*, 831 N.W.2d 594, 601 (Minn. 2013); *State v. Brown*, 815 N.W.2d 609, 615-18 (2012); they may impose a photo-ID requirement for all spectators, *Taylor*, 869 N.W.2d 1 at 11-12; they may even lock "the courtroom door and requir[e] members of the public to contact court administration to gain entry to the courtroom during voir dire and the evidentiary phase of trial," *State v. Garrison*, No. A14-1998, 2015 WL 7201069, at *3-4 (Minn. Ct. App. Nov. 16, 2015); and all of these restrictions may be imposed without making *Waller* findings on the record beforehand because, in each instance, Minnesota courts simply concluded that the closures are not "true" constitutional closures and therefore that *Waller* does not apply.

This Court expresses significant concern with this development. *See Tucker*, 677 F. App'x at 776 (criticizing Pennsylvania courts for "not applying *Waller* when analyzing defendants' Sixth Amendment public-trial claims"). While the Court expresses no view about the constitutionality or appropriateness of any one of the aforementioned practices, the overall trend in Minnesota is undoubtedly toward more restrictions and closures – irrespective of whether they are classified as true, total, partial, or otherwise. Indeed, members of the Minnesota Supreme Court themselves have criticized this "creeping courtroom closure." *Silvernail*, 831 N.W.2d at 607-09 (Anderson, J., dissenting); *Brown*,

815 N.W.2d at 622-27 (Meyer J., dissenting).[17]  Minnesota courts would be wise to honor the professed wishes of its highest court:  "We do not want anyone to be discouraged from attending or viewing proceedings in Minnesota courts.  'One of our solemn obligations is to ensure Minnesota's courts remain open and accessible to all.  Upholding this commitment is a central mission of our Judicial Branch, and it guides our every step . . . .'"  *Taylor*, 869 N.W.2d at 12 & n.6 (quoting Chief Justice Lorie S. Gildea, Speech to Minnesota State Bar Association (June 26, 2014)).

## V.    REMEDY

"[A] violation of the right to a public trial is a structural error."  *Weaver v. Massachusetts*, 137 S. Ct. 1899, 1908 (2017).  This is so "because of the 'difficulty of assessing the effect of the error.'"  *Id*. at 1910 (quoting *United States v. Gonzalez-Lopez*, 548 U.S. 140, 149 n.4).  "Despite its name, the term 'structural error' carries with it no talismanic significance as a doctrinal matter.  It means only that the government is not entitled to deprive the defendant of a new trial by showing that the error was 'harmless

---

[17] Academic work too has criticized both Minnesota precedent on courtroom closures and the triviality exception generally.  *See* Kristin Saetveit, Note, *Close Calls: Defining Courtroom Closures Under the Sixth Amendment*, 68 STAN. L. REV. 897, 925 (2016) ("Lower courts' replacement of *Waller*'s test with ad hoc determinations regarding a closure's 'triviality' constitutes evasion of controlling Supreme Court precedent."); Zach Cronen, Note, *Criminal Law: Behind Closed Doors: Expanding the Triviality Doctrine to Intentional Closures* - State v. Brown, 40 WM. MITCHELL L. REV. 252, 269, 281 (2013) ("[*Brown*] further muddies the analysis between trivial closures and harmless errors, running afoul of U.S. Supreme Court precedent."); Daniel Levitas, Comment, *Scaling* Waller: *How Courts Have Eroded the Sixth Amendment Trial Right*, 59 EMORY L.J. 493, 533 (2009) ("Courts often employ post hoc rationales justifying closure despite the plain language of *Waller* that forbids it.").

beyond a reasonable doubt.'" *Id.* (quoting *Chapman v. California*, 386 U.S. 18, 24 (1967)). "[I]n the case of a structural error . . . , the defendant generally is entitled to 'automatic reversal' regardless of the error's actual 'effect on the outcome.'" *Id.* (quoting *Neder v. United States*, 527 U.S. 1, 7 (1999)). But for a violation of a criminal defendant's public-trial right, "the remedy should be appropriate to the violation" so as to serve "the public interest" and avoid "a windfall for the defendant." *Waller*, 467 U.S. at 50.

"It is a truism that constitutional protections have costs." *Coy v. Iowa*, 487 U.S. 1012, 1020 (1988). Smith insists that he is entitled to a new trial. The Government maintains that the public-trial violation should be remedied by a public bench conference and a new trial should be ordered only if that public bench conference would result in a material change to the trial court's ruling. The Court seriously doubts that any remedy it could craft would be appropriate to the violation and not result in a windfall for Smith. But the Court need not undertake such an endeavor because Smith is not entitled to federal habeas relief.

## VI.    CERTIFICATE OF APPEALABILITY

The Court may grant a Certificate of Appealability only if the petitioner "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The petitioner must show that the issues are debatable among reasonable jurists, that a court could resolve the issues differently, or that the issues deserve further proceedings. *Flieger v. Delo*, 16 F.3d 878, 882-83 (8th Cir. 1994).

As the Court's Opinion makes clear, Smith has made a substantial showing that his constitutional right to a public trial was denied.  He also has shown that reasonable jurists would find the issues raised in his habeas petition debatable, that some other court could resolve the issues differently, and that the issues deserve further proceedings.  The Court will therefore grant a Certificate of Appealability.

## CONCLUSION

AEDPA's deference necessarily means that some constitutional violations will go unremedied by federal courts, but not unnoticed.  This is likely one such case.  Despite the relatively short closed interruption in the trial, the Minnesota trial court appears to have violated Smith's Sixth Amendment right to a public trial.  And the Minnesota Supreme Court's decision – while neither contrary to nor involving an unreasonable application of clearly established federal law – comes perilously close to satisfying AEDPA's strict standards.

The Minnesota Supreme Court no doubt acted in good faith and with the best of intentions.  It relied on its own precedent in concluding that the closure here did not implicate Smith's Sixth Amendment right to a public trial.  But the Minnesota Supreme Court's decision and the precedent on which it relies demonstrate precisely the risk of a slow but steady erosion of constitutional rights by the well-intentioned that must be vigilantly guarded against.  The Founders enshrined in the Constitution the right to a public trial.  And in so doing, they made a judgment about how criminal trials can best be fair:  by being public.  Judges may not flout that constitutional command absent the necessary

findings beforehand in conformance with the instructions of our nation's highest court. Quite simply, process matters.

It is the judgment of this Court that Minnesota trial courts should curb their practice of closing their courtrooms during criminal trials – or at least perform the Supreme-Court-mandated *Waller* analysis on the record first. If they do not, Minnesota might soon find itself in Georgia's shoes: on the losing end of a summary reversal by the Supreme Court of the United States.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, Petitioner's Objection [Docket No. 22] is **OVERRULED** and the Report and Recommendation of the Magistrate Judge [Docket No. 21] is **ADOPTED** to the extent consistent with this Opinion. **IT IS HEREBY ORDERED** that:

1.    Smith's Petition for a Writ of Habeas Corpus [Docket No. 1] is **DENIED**.

2.    This action is **DISMISSED with prejudice**.

3.    For purposes of appeal, the Court **GRANTS** a Certificate of Appealability under 28 U.S.C. § 2253(c)(2).

**LET JUDGMENT BE ENTERED ACCORDINGLY.**


DATED:  August 3, 2018                                    _____s/John R. Tunheim_____
at Minneapolis, Minnesota.                               JOHN R. TUNHEIM
                                                                          Chief Judge
                                                                          United States District Court